# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY SMYLIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 C 1403 |
| | ) | |
| LORETTO HOSPITAL, | ) | Judge John W. Darrah |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Gregory Smylie, filed suit against Defendant, Loretto Hospital, alleging Loretto discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e). Presently before the Court is Loretto's Motion for Summary Judgment.

## BACKGROUND

Smylie was hired by Loretto as a Mechanic on March 14, 2002. (Def.'s 56.1(a)(3) Statement ¶ 22). At the time of Smylie's employment, Loretto employed two Mechanics. (Id., ¶ 12). Willie Suszek, the Associate Vice President of Support Services, while not ordinarily responsible for interviewing and hiring potential employees, interviewed and decided to hire Smylie. Suszek conducted the interview and made the decision to hire Smylie because at the time the Plant Operations Department was understaffed. (Id., ¶¶ 16, 23). Suszek's duties included the overall supervision of the Plant Operations Department, Public Safety Department, Security Department, Environmental Services Department, Biomedical Engineering Department, Telecommunications Department, and serving as Loretto's Safety Officer. (Id., ¶ 17). Suszek did not have the responsibility of investing employee complaints or making final discipline decisions. (Id., ¶ 19).

Smylie's supervisor, Harold Oberg, was the Chief Engineer of Plant Operations. (Def.'s 56.1(a)(3) Statement ¶¶ 13-14). Oberg's duties included distributing work assignments, overseeing the engineers and mechanics, and performing certain engineer-related work throughout the hospital. (Id., ¶ 15). At the time of Smylie's employment, Oberg supervised two mechanics, Smylie and Verdez Hale, both African-American males. (Id., ¶ 20). Oberg evaluated the performance of his employees and recommended discipline for his employees, but he did not have responsibility for investigating employee complaints or making final discipline decisions. (Id., ¶ 18). Oberg reported to Suszek. (Id., ¶ 16).

During Smylie's employment, Denise Hunter was the Vice President of Human Resources. (Def.'s 56.1(a)(3) Statement ¶ 5). Hunter oversaw the Human Resources Department and had final decisions in hiring and firing as well as determining appropriate discipline for employees. (Id., ¶ 6). Hunter was also responsible for investigating complaints. (Id., ¶ 7). Ruby Smith was employed as a Human Resource Generalist, serving as Hunter's direct assistant on all matters. (Id., ¶¶ 8-9).

When hired, Smylie received an employee handbook. (Def.'s 56.1(a)(3) Statement ¶ 25). The employee handbook includes an anti-harassment policy that outlines prohibited behavior, the hospital's complaint process for reporting harassment, and the hospital's policy against complaint-related retaliation. (Id., ¶¶ 24, 26). Smylie was aware of the anti-discrimination policy. (Id., ¶ 27). Pursuant to the policy, when harassment is reported, the Human Resources Department investigates the complaint and takes appropriate remedial action against the alleged harasser when warranted. (Id., ¶ 28).

As a mechanic at Loretto, Smylie was a member of the International Union of Operating Engineers Local 399. (Def.'s 56.1(a)(3) Statement ¶ 29). A collective bargaining agreement

between the Union and Loretto governed the terms and conditions of Smylie's employment. (Id., ¶ 30). The CBA provides, "Any employee who refuses to cooperate with testing procedures or tests positive for drug and/or alcohol use will be terminated for a first offense." (Id., ¶ 31).

On the afternoon of December 13, 2002, Oberg was looking for Smylie in the hospital. (Def.'s 56.1(a)(3) Statement ¶ 32). Oberg called for Smylie on the hospital's intercom several times. (Id., ¶ 33). Hale informed Oberg that Smylie had left the hospital and had not returned. (Id., ¶ 34). Smylie claimed that he was feeling ill that day and that Hale drove him home. (Id., ¶ 35).

On December 17, 2002, Oberg completed a disciplinary action form regarding Smylie's abandoning work on December 13, 2002. Oberg recommended suspension/discharge pending an investigation. (Def.s' 56.1(a)(3) Statement ¶ 36). Smylie did not sign the disciplinary action form. (Id., ¶ 37). Smylie wrote under "Employee Comments," "I didn't intend to leave work. I was on medication and incoherent at the time. Dr. Orders. I would like to have a nother [sic] chance to work this out." (Id., ¶ 38).

Sometime between December 17, 2002 and December 19, 2002, Hunter and Smith called Smylie to explain that they had concluded their investigation and that due to job abandonment, Smylie was terminated. (Def.'s 56.1(a)(3) Statement ¶ 39). On December 19, 2002, Hunter wrote Smylie a termination letter, effective immediately. (Id., ¶ 40).

Sometime after Smylie received the termination letter, Smylie telephoned Hunter and asked her to reconsider the termination because Smylie felt that he did not violate hospital policy. (Def.'s 56.1(a)(3) Statement ¶ 41). Shortly thereafter, Smylie spoke with Suszek. Suszek was not inclined to reinstate Smylie. (Id., ¶ 42). Nevertheless, Hunter reinstated Smylie pursuant to a last-chance agreement. (Id., ¶ 43). Smylie understood that under the last-chance agreement, another violation

3

of hospital policy could cost him his job. (Id., ¶ 44). Smylie signed the last-chance agreement. (Id., ¶ 45). The Union did not file a grievance regarding Smylie's termination, reinstatement, or any alleged loss of overtime. (Id., ¶¶ 46-47).

On December 26, 2002, Smylie sent a letter to Steve Drucker, CEO of Loretto, Oberg, and Hunter, regarding his December 2002 termination for abandoning his position. (Def.'s 56.1(a)(3) Statement ¶ 48). The letter did not mention racial harassment. (Id., ¶ 49). On July 3, 2003, Smylie sent another letter to Drucker. While the letter was titled "Harassment," it did not mention racial harassment. (Id., ¶¶ 50-51).

On August 19, 2003, Hunter called Smith and told her that she encountered Smylie in the cafeteria and had a brief discussion with him and that he appeared to be under the influence of drugs or alcohol. (Def.'s 56.1(a)(3) Statement ¶¶ 52-53). Hunter told Smith that she believed Smylie needed to be tested for drugs and alcohol, but she wanted Smith to observe Smylie for herself and determine if she believed he needed to be tested. (Id., ¶ 54).

Smith called Smylie to come to the Human Resources Department over the hospital intercom. (Def.'s 56.1(a)(3) Statement ¶ 55). Smith also called Suszek and asked him to also come to Smith's office. (Id., ¶ 56). Smith told Suszek that a complaint was made about Smylie's possibly being under the influence of drugs and that she wanted him to observe Smylie. (Id., ¶ 57). Smith and Suszek observed that Smylie was unusually fidgety and that his eyes appeared glassy. (Id., ¶ 58). Smith and Suszek agreed that Smylie needed to be tested for drugs and alcohol. (Id., ¶ 59).

Smith informed Smylie that he would have to submit to a drug and alcohol test. (Def.'s 56.1(a)(3) Statement ¶ 60). Initially, Smylie agreed to take the test. Then, Smylie resisted taking the test, asking for an attorney, a Union representative, and his wife. (Id., ¶ 61). Smith offered

4

Smylie the opportunity to contact his Union. (Id., ¶ 62). Smith also informed Smylie that his employment could be terminated for not taking the drug and alcohol test. (Id., ¶ 63).

Smylie spoke with a Union representative on the telephone and then agreed to take the drug and alcohol test. (Def.'s 56.1(a)(3) Statement ¶ 64). Smylie signed a "Consent to Drug and Alcohol Screening" form. (Id., ¶ 65). Smith, Suszek, and Smylie then went to Loretto's laboratory, where a urine sample for the test was taken. (Id., ¶ 66). Don Lindeman, the Laboratory Director, administered the screening and collection of Smylie's urine. (Id., ¶ 67). Smylie also gave a blood sample for an alcohol test. (Id., ¶ 70). Lindeman denied Smylie's request for a sample of his urine sample. (Id., ¶¶ 72-73). Smylie signed the "Chain of Custody" form for his test samples. (Id., ¶ 74).

Smylie's test samples were analyzed by Lab Corp., a nationally recognized drug and alcohol testing company. (Def.'s 56.1(a)(3) Statement ¶ 75). Smylie's drug test came back positive for cocaine. (Id., ¶ 76). On August 26, 2003, Hunter and Smith met with Smylie to give him a letter of termination based on the positive drug test. (Id., ¶ 77). Smylie also received a copy of the drug test results from Lab Corp. (Id., ¶ 78). Smylie signed the termination letter, acknowledging receipt of the letter and the results of his drug test. (Id., ¶ 79).

On September 3, 2003, Smylie filed a grievance with the Union, stating that he was falsely accused of using drugs. (Def.'s 56.1(a)(3) Statement ¶ 81). On October 18, 2003, a second-step hearing was held on Smylie's grievance. (Id., ¶ 82). At that time, Smylie presented a photocopy of another drug test that was purportedly based on a sample that was taken more than four hours after the sample he gave to Lindeman and which purported to show Smylie had tested negative for cocaine. (Id., ¶ 83). The second lab test was administered by Qwest Diagnostics. (Id., ¶ 85). Laboratory representatives from both Lab Corp. and Qwest were contacted during the grievance

procedure. (Id., ¶ 86). Both laboratory representatives stated that the lapse of time, intake of liquids, and an individual's metabolism could all affect the detectable presence of cocaine in Smylie's system and that the second test did not call into question the accuracy of the first test. (Id., ¶ 87). The grievance was denied, and the Union took the case to arbitration. (Id., ¶ 88). At no point during the grievance did Smylie identify race as a motivating factor for his termination. (Id., ¶ 84).

On June 23, 2004, an arbitration hearing was held to determine whether Smylie was discharged for just cause. (Def.'s 56.1(a)(3) Statement ¶ 89). Smylie, Hunter, Suszek, and Smith testified at the arbitration hearing. (Id., ¶ 90). Brad Black, a supervisor at Lab Corp., testified by telephone at the arbitration hearing. (Id., ¶91). Other than Smylie, the Union did not call any other persons to testify on Smylie's behalf. (Id., ¶ 92). On August 5, 2004, the arbitrator issued a written decision, denying Smylie's grievance after finding that Smylie was terminated for just cause based on his positive drug test. (Id., ¶¶93, 97).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001).

In the instant case, Smylie did not file a response to Loretto's motion and has not disputed any of Loretto's statements of material facts. Therefore, all the material facts averred by Loretto are deemed admitted. *See Oates v. Discovery Zone*, 116 F.3d 1161, 1167 (7th Cir. 1997); L.R. 56.1(b)(3)(B). Even though Smylie failed to respond to Loretto's statement of material facts and such facts are deemed admitted, Loretto's Motion for Summary Judgment will only be granted if it can demonstrate that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *See Johnson v. Gudmundson*, 35 F.3d 1104, 1112 (7th Cir. 1994).

Title VII makes it unlawful for an employer to fail or refuse to hire an individual, or otherwise discriminate against an individual with respect to his compensation, based on that person's race. 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove discrimination through either direct or circumstantial evidence or the indirect burden-shifting method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir. 1999) (*Jackson*). Direct evidence is defined as "evidence 'which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption.'" *Plair v. E.J. Brach & Sons*, 105 F.3d 343, 347 (7th Cir. 1997) (citation omitted). In an employment discrimination case, direct evidence must speak directly to the issue of discriminatory intent; and it must relate to the specific employment decision in question. *Cowen v. Glenbrook Security Serv., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997). Smylie has not presented any direct evidence of discrimination; thus, the focus is on the *McDonnell Douglas* burden-shifting method.

Under the *McDonnell Douglas* burden-shifting test, the plaintiff must first establish a *prima facie* case by the preponderance of the evidence. *Jackson*, 176 F.3d at 982. If the plaintiff establishes a *prima facie* case, a rebuttable presumption is created; and the employer must come

forward with evidence of a legitimate, nondiscriminatory reason for its actions. If the employer meets this requirement, the burden shifts back to the plaintiff to demonstrate, again, by a preponderance of the evidence, that the reasons proffered by the employer are actually a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804; *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 394 (7th Cir. 1998) (*Adreani*).

To establish a *prima facie* case of race discrimination, a plaintiff must establish: (1) that he was a member of a protected class, (2) that he was performing his job satisfactorily, (3) that he experienced an adverse employment action, and (4) that similarly situated individuals were treated more favorably. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 650 (7th Cir. 2001).

Smylie has established that he is a member of a protected class and that he experienced an adverse employment action - his termination of employment. However, he has failed to establish that he was performing his job satisfactorily in light of his positive drug test. He also has failed to identify any similarly situated individuals who were treated more favorably.[1] Accordingly, Smylie has failed to establish a *prima facie* case of discrimination.

Even if Smylie was able to establish a *prima facie* case, he has failed to establish that Loretto's reason for terminating his employment, a positive drug test, was a pretext to race discrimination. A plaintiff can establish pretext by showing that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998) (*Debs*). Pretext in this context does

---

[1] At his deposition, Smylie also alleged that he received less overtime because of his race. Smylie has failed to identify a similarly situated non-African-American employee who received more overtime than he.

not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir 1995). An honest belief in the nondiscriminatory reason offered by the decision-maker will be sufficient even if the reasons are foolish, trivial, or even baseless. *Debs*, 153 F.3d at 396.

The undisputed facts establish that Smylie tested positive for cocaine and was terminated for the positive drug test. Smylie's grievance concerning the reason for his drug test was fully adjudicated, affirming Smylie's termination for testing positive for cocaine.

Smylie also alleges that he was subjected to a hostile work environment based on comments made to him relating to his race.

Title VII allows a plaintiff to bring a cause of action for racial harassment that creates a hostile or offensive work environment. *See Duhart v. Fry*, 957 F.Supp. 1478, 1491 (N.D. Ill. 1997). To establish a hostile work environment claim under Title VII, a plaintiff must prove; (1) the workplace was permeated with discriminatory intimidation, ridicule, or insult that was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment; (2) the harassment was based on plaintiff's race; (3) the plaintiff perceived the work environment to be hostile or abusive; (4) a reasonable person would have perceived the work environment to be hostile or abusive; and (5) the employer knew or reasonably should have known that the plaintiff was being subjected to such treatment, and it did not take appropriate corrective action. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (7th Cir.1999).

For harassment to be actionable under Title VII, the employer's actions must be sufficiently severe or pervasive so as to "alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 477 U.S. 57, 67 (1986). Title VII

is not directed against unpleasantness *per se* but rather against discrimination in the conditions of employment. *Drake v. Minnesota Mining & Mfg. Co.*, 143 F.3d 878, 885 (7th Cir. 1998), *quoting Carr v. Allison Gas Turbine*, 32 F.3d 1007, 1009 (7th Cir. 1994).

At his deposition, Smylie testified to five incidents which he deemed as racially offensive. Smylie claimed that Suszek called him "boy" on two occasions, "monkey-ass" on one occasion, and made a comment regarding an array of African-American portraits in which she said to Oberg, "It's something that I've got to come and work with these black motherfuckers, then to see these pictures staring over my head all the time." Smylie also alleges that Oberg once stated that he "would sure like to fuck that black-ass chick there." Smylie does not identify the time frame in which these comments were made over his more-than-two-year employment with Loretto.

Assuming the alleged comments were made -- both Suszek and Oberg deny making the comments -- Smylie has failed to demonstrate that the comments were sufficiently severe or pervasive so as to alter the conditions of Smylie's employment and create an abusive working environment. Smylie never complained to anyone at Loretto about any of the comments or that he was subjected to an abusive work environment. Furthermore, the comments fail to establish an objectively hostile work environment. *See Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (ten offensive comments, only four of which were sexual in nature, over several months were insufficient to make work environment objectively offensive).

Furthermore, there is no evidence that Smylie perceived his work environment to be hostile or abusive. Instead, the undisputed facts demonstrate that Smylie never complained about an abusive or hostile environment based on his race even though he complained about other aspects of his employment that he thought were unjust, *i.e.*, both of his terminations.

For the foregoing reasons, Loretto's Motion for Summary Judgment is granted.

Dated: January 26, 2005

JOHN W. DARRAH
United States District Judge